UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

| | | |
|---|---|---|
| CRYSTINA BASS, | ) | |
| CHRISTOPHER A. BASS, | ) | |
| MAVIE DENISE YOUNGSON, and | ) | |
| TIMOTHY WAYNE YOUNGSON, | ) | |
| | ) | |
| *Plaintiffs*, | ) | **Consolidated Cases** |
| | ) | No. 1:17-CV-108 |
| v. | ) | No. 1:17-CV-69 |
| | ) | REEVES/STEGER |
| OLIM KODIROV, PROCTER & GAMBLE DISTRIBUTING, LLC, PROCTER & GAMBLE MANUFACTURING CO., PROCTER & GAMBLE CO., PROCTER & GAMBLE, and LOGISTICS BUDDY TRANSPORTATION, LLC, | ) ) ) ) ) ) | |
| *Defendants*, | ) | |
| v. | ) | |
| LOGISTICS BUDDY, LLC, | ) | |
| *Defendant and Cross-Claimant*, | ) | |
| v. | ) | |
| BOBO TRANSPORTATION, INC., | ) | |
| *Defendant and Cross-Defendant*. | ) | |

## MEMORANDUM AND ORDER

This case concerns liability for a motor vehicle collision involving a tractor-trailer transporting batteries. Specifically, Plaintiffs Mavie Denise Youngson and Timothy Wayne Youngson (the "Youngson Plaintiffs") and Plaintiffs Crystina Bass and Christopher A. Bass (the "Bass Plaintiffs") allege that their respective vehicles were struck by a tractor-trailer negligently operated by Defendant Olim Kodirov in the employ of Defendants Bobo Transportation, Inc.,

1

Logistics Buddy, LLC, and Logistics Buddy Transportation, LLC on behalf of Defendants Procter & Gamble Distributing, LLC, Procter & Gamble Manufacturing Co., Procter & Gamble Co., Procter & Gamble (collectively, the "P&G Defendants"), through various contractual relationships. Further, the Plaintiffs also allege negligence on various grounds by the other Defendants.

This matter comes before the Court on four motions: a motion for summary judgment filed by the P&G Defendants [D. 155; 1:17-CV-69, D. 150]; the Bass Plaintiffs' motion for a separate trial from the Youngson Plaintiffs [D. 197; 1:17-CV-69, D. 194]; the Bass Plaintiffs' motion requesting a status conference and/or pretrial conference [D. 203; 1:17-CV-69, D. 200]; and Defendant Kodirov and Defendant Bobo Transportation, Inc.'s joint motion to amend the scheduling order [D. 209; 1:17-CV-69, D. 206]. The Court will first address the summary judgment motion, followed by the motions for a separate trial, for a status conference, and for an amendment to the scheduling order.

I.   **P&G Defendants' Motion for Summary Judgment**

   A. **Background**

On March 12, 2016, the Bass Plaintiffs[1] were driving eastbound on I-24 in Marion County when their vehicle was struck by a tractor-trailer, which was also driving eastbound. As a result of the collision, the Bass Plaintiffs have brought this suit for damages. The tractor-trailer involved in the collision was transporting a load of Duracell batteries.

The transportation of this load of batteries was in fulfillment of a set of logistics agreements dating from September 1, 2015. The Gillette Company ("Gillette"), a subsidiary of The Procter & Gamble Company and then-parent of Duracell, entered into a Master Logistics Services Agreement ("MLSA") with transportation broker Exel, Inc. ("Exel"). In accordance with the MLSA on that same day, Gillette and Exel executed a Supplemental Logistics Agreement

---

[1] In these consolidated cases, only the Bass Plaintiffs have brought suit against the P&G Defendants. Consequently, this motion for summary judgment does not pertain to the action brought by the Youngson Plaintiffs in case number 1:17-CV-69.

("Supplemental Agreement"), which included the transportation of the load that is the subject of this lawsuit.

However, The Procter & Gamble Company and The Duracell Company entered into an arrangement that sold off the Duracell business through the General Assignment and Bill of Sale Agreement ("Bill of Sale") that was "made and delivered" on February 29, 2016. The Bill of Sale was pursuant to an agreement ("Transaction Agreement"), dated November 13, 2014, between The Procter & Gamble Company, Berkshire Hathaway Inc. ("Berkshire Hathaway"), and PhoenixCo, Inc., which is a predecessor entity to Duracell. In Paragraph 2 of the Bill of Sale, The Procter & Gamble Company agreed to "sell[], assign[], transfer[], convey[] and deliver[] to [The Duracell Company] . . . in accordance with the Transaction Agreement, all . . . right, title and interest in and to the Acquired Assets." However, pursuant to Paragraph 3 of the Bill of Sale, "Acquired Assets shall not include, and [The Duracell Company] shall not purchase, acquire or otherwise obtain, any right, title or interest in, to or under any Excluded Asset."

Though the term "Acquired Asset" is not defined in the Bill of Sale, under Paragraph 1 of the Bill of Sale, "[c]apitalized terms used herein and not defined have the meanings given to such terms in the Transaction Agreement." Section 1.05(a) of the Transaction Agreement, states that, "'Acquired Assets' means all Assets owned or held by [The Procter & Gamble Company] or any of its Subsidiaries as of the time of the Closing . . . and primarily used or held for primary use in the [Duracell] Business." Further, under Section 1.05(v), "Acquired Assets" include "all interests, rights, claims and benefits of [The Procter & Gamble Company] . . . pursuant to, and associated with, all [Duracell] Contracts, other than To-Be-Delivered [Duracell] Material Contracts that [Berkshire Hathaway] declines to have [The Duracell Company] and its Subsidiaries assume in accordance with notice given to [The Procter & Gamble Company] pursuant to Section 4.15(c)" of the Transaction Agreement. The Procter & Gamble Company received no notice that Berkshire Hathaway declined to have The Duracell Company assume the Logistics Agreements involved in this lawsuit.

The signature page of the Bill of Sale contains signatures of Ken Patel, Vice President and General Counsel for The Procter & Gamble Company, and Hatsuki Miyata, Vice President and Assistance Secretary of The Duracell Company, who "executed" the Bill of Sale as of February 29, 2016. According to Paragraph 2 of the Bill of Sale, "[s]ubject to Section 1.08 of the Transaction Agreement," the Bill of Sale "shall be deemed" to convey the Acquired Assets "effective upon receipt of the Consent of the third party thereto after the Closing." However, Paragraph 6 of the Bill of Sale states that "[t]his Bill of Sale and the transactions contemplated hereby will become effective immediately prior to the Closing." Despite being defined terms, neither "Consent" nor "Closing" are defined in the Bill of Sale or in the portion of the Transaction Agreement that is before the Court.

In the P&G Defendants' motion for summary judgment, the P&G Defendants assert that the Bill of Sale assigned the Logistics Agreements involved in this lawsuit prior to the date of the collision, transferring any and all potential liability in this suit to The Duracell Company. The Bass Plaintiffs contend that there is not sufficient evidence to determine whether the Logistics Agreements were conveyed prior to the collision.

### B. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party

4

must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

### C. Analysis

Here, the P&G Defendants have argued that the rights and liabilities of the Logistics Agreements were assigned prior to the accident through the Bill of Sale, cutting off any potential liability for the claims asserted by the Bass Plaintiffs against the P&G Defendants. The Bass Plaintiffs contend that the P&G Defendants have not presented sufficient admissible evidence to support the assertion that the Logistics Agreements were assigned. The Bass Plaintiffs have not argued that potential liability for any of its claims would remain with the P&G Defendants even if the Logistics Agreement were assigned, so the Court will limit its analysis to whether, viewing the facts on the record in the light most favorable to the Bass Plaintiffs, the Logistics Agreements were assignable and were assigned prior to the collision through the Bill of Sale dated February 29, 2016.

#### 1. Choice of Law

As a threshold matter the Court must determine which jurisdiction's law applies. The Bass Plaintiffs have alleged that the P&G Defendants were directly negligent on multiple grounds, giving rise to the collision that forms the basis of this case. "Under the *Erie* doctrine, federal courts

sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). Consequently, the Court must follow Tennessee's choice of law rules. In tort cases, such as negligence, Tennessee uses the "most significant relationship" test. *Hataway v. McKinley,* 830 S.W.2d 53, 59 (Tenn. 1992).

Here, the parties agree that Tennessee substantive law applies. Nevertheless, though this is an action for negligence, the motions before the Court dispute the contractual relationships of the defendants, which entails contract interpretation. Specifically, the P&G Defendants argue that the Bill of Sale assigned the Logistics Agreements under which the tractor-trailer involved in the collision was operating. The Bass Plaintiffs argue that the evidence before the Court in light of the language of the four contracts (the MLSA, the Supplemental Agreement, the Bill of Sale, and the Transaction Agreement) is insufficient to establish that the Logistics Agreements were both assignable and were both assigned.

In Tennessee, "parties ordinarily are free to contract that the law of some jurisdiction other than that of the place of making will govern their relationship." *Goodwin Bros. Leasing, Inc. v. H & B, Inc.,* 597 S.W.2d 303, 306 (Tenn. 1980). Two choice of law provisions appear in the key relevant contracts before the Court and both provisions, Section 11.13.1 of the MLSA and Paragraph 8 of the Bill of Sale, point to Delaware law for the interpretation of the contracts.

Under Delaware law, as in Tennessee,[2] contract interpretation is a question of law. *Ohio, Pennsylvania & W. Virginia Coal Co. v. PanEnergy Corp.*, 120 F.3d 607, 610 (6th Cir. 1997) (citing *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del. 1991)). The Court must first attempt to ascertain the intent of the parties from the language contained in the contract. *Id.* (citing *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 822 (Del. 1992)). "If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *Id.* (citing *City Investing Co. Liquidating Trust v.*

---

[2] Contract interpretation is a question of law for the Court. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). "A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Id.* "In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent." *Id.*

*Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)). However, a court is not free to disregard extrinsic evidence of the parties' intent "if the words of the agreement can only be known through an appreciation of the context and circumstances in which they were used. In that situation the language used by the parties is subject to different meanings and is, thus, ambiguous." *Id.* (citing *City Investing Co. Liquidating Trust*, 624 A.2d at 1198). Contractual language is not rendered ambiguous simply because parties disagree over its meaning. *Id.*

### 2. Assignability and Assignment

The Court will first address whether, under the language of MLSA and the Supplemental Agreement, the Supplemental Agreement was assignable. Second, the Court will determine whether the Supplemental Agreement was assigned through the Bill of Sale prior to the collision.

#### a. *Assignability*

Delaware courts generally uphold the validity of clauses in contracts that frame the scope within which subsequent transfers and assignments may be made. *See SLMSoft.Com, Inc. v. Cross Country Bank*, No. CIV.A.00C09163JRJ, 2003 WL 1769770, at *9 (Del. Super. Ct. Apr. 2, 2003); *Paul v. Chromalytics Corp.*, 343 A.2d 622, 625 (Del. Super. Ct. 1975).

Here, Section 11.3 of the MLSA, dated September 1, 2015, states that "[the P&G Defendants] may, without restriction, transfer or assign this [MLSA] in whole or in part or any of its right or obligations hereunder, by delegation, operation of law, or otherwise without the prior written consent of [Exel]." The Supplemental Agreement contains no provisions regarding assignability. However, Section 2.2 the MLSA states that "[e]ach [Supplemental Agreement] shall incorporate by reference the terms and conditions of this [MLSA]," which would include the term giving the P&G Defendants the right of free assignability. Further, the Supplemental Agreement states that it was made "pursuant to" the MLSA. Under the plain language of the MLSA and Supplemental Agreement, the Supplemental Agreement, dated September 1, 2015, under which the tractor-trailer was operating on March 12, 2016, both were assignable.

### b. Assignment

An effective assignment of a contract right requires that the owner of that right "manifest his intention to make a present transfer of the right without any further action by him or by the obligor." *Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*, 1999 WL 160148, at *5 n. 16 (Del.Ch. Mar.11, 1999) (citing Restatement (Second) of Contracts § 317(1)). The conveyance of substantially all assets of a business entity that is are party to a contract can manifest the intention to assign the contract right. *See, e.g.*, *Boeing Co. v. Spirit Aerosystems, Inc.*, No. CVN14C12055EMDCCLD, 2017 WL 2799174, at *1 (Del. Super. Ct. June 27, 2017); *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, No. CIV.A. 3718-VCP, 2010 WL 338219, at *11 (Del. Ch. Jan. 29, 2010). The parties do not dispute that the Bill of Sale may have assigned the Logistics Agreements in question, but rather the disputes are whether the record shows that Bill of Sale assigned the Logistics Agreements and whether that assignment occurred prior to the collision.

Here, the P&G Defendants sold Duracell assets to The Duracell Company through the Bill of Sale. The Bill of Sale, by its terms, occurred "pursuant to the Transaction Agreement, dated as of November 13, 2014." In the Bill of Sale, the P&G Defendants agreed to "sell, assign, transfer, convey and deliver to [The Duracell Company] any such Acquired Asset, effective upon receipt of the Consent of the third party thereto after the Closing." However, Paragraph 3 of the Bill of Sale states that "[t]he Acquired Assets shall not include, and [The Duracell Company] and its Subsidiaries shall not purchase, acquire or otherwise obtains, any right, title or interest in, to or under any Excluded Asset." The Bass Plaintiffs assert that there is insufficient evidence to determine whether the Logistics Agreements were "Acquired Assets" or "Excluded Assets" under the Bill of Sale.

The term "Acquired Asset" is not defined in the Bill of Sale, but under Paragraph 1 of the Bill of Sale, "[c]apitalized terms used herein and not defined have the meanings given to such terms in the Transaction Agreement." Section 1.05(a) of the Transaction Agreement, states that, "'Acquired Assets' means all Assets owned or held by [The Procter & Gamble Company] or any

of its Subsidiaries as of the time of the Closing . . . and primarily used or held for primary use in the [Duracell] Business." Further, under Section 1.05(v), "Acquired Assets" include "all interests, rights, claims and benefits of [The Procter & Gamble Company] . . . pursuant to, and associated with, all [Duracell] Contracts, other than To-Be-Delivered [Duracell] Material Contracts that [Berkshire Hathaway] declines to have [The Duracell Company] and its Subsidiaries assume in accordance with notice given to [The Procter & Gamble Company] pursuant to Section 4.15(c)" of the Transaction Agreement. It has not been disputed that no notice was given that Berkshire Hathaway declined to have The Duracell Company assume the Logistics Agreements. Consequently, the plain language of the contracts and the undisputed facts before the Court show that the Logistics Agreements were assigned through the Bill of Sale as Acquired Assets. If potential liability in this case followed the Logistics Agreements, the P&G Defendants conveyed the Logistics Agreements to The Duracell Company and potential liability transferred when the Bill of Sale became effective.

However, under Paragraph 2 of the Bill of Sale, the sale or assignment of "Acquired Assets" was "effective upon receipt of the Consent of the third party thereto after the Closing," subject "to Section 1.08 of the Transaction Agreement." Section 1.08 of the Transaction Agreement is not before the Court. The terms "Consent" and "Closing," defined terms whose meaning is to be derived from the Transaction Agreement, are also not defined in the portion of the Transaction Agreement before the Court. Likewise, because the portions of the Transaction Agreement that define the terms "Consent" and "Closing" in the Bill of Sale are not before the Court, the Court cannot elucidate whether Paragraph 2 and Paragraph 6 of the Bill of Sale, which address the effective time of the transactions, are consonant or dissonant, leading to ambiguity in the Bill of Sale regarding timing of effectiveness. Further, there is no evidence on the record regarding when or if "Consent" was given by the "third party," as specified in Paragraph 2 of the Bill of Sale for the effectiveness of the transaction. The signature page of the Bill of Sale reflects only signatures for representatives of The Procter & Gamble Company and The Duracell Company. Though the Bill of Sale was "made and delivered" on February 29, 2016, the record

and the plain language of the contracts are not sufficient to show that the transactions were undisputedly *effective* prior to the collision. Based on the P&G Defendants' assertion that any potential liability follows the Logistics Agreements as assigned through the Bill of Sale, this fact is material and unresolved.

In short, "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250. Consequently, summary judgment for the P&G Defendants should be denied.

### II. Motion for Separate Trial

This case was previously consolidated pursuant to Rule 42 [D. 44]. FED. R. CIV. P. 42(a). Nevertheless, the Court may order separate trials for the sake of "convenience, to avoid prejudice, or to expedite and economize" the litigation. FED. R. CIV. P. 42(b). The decision to bifurcate is within the discretion of the trial court and is dependent on the facts and circumstances of each case. *Saxion v. Titan-C-Mfg., Inc.*, 86 F.3d 553, 556 (6th Cir. 1996).

Here, the Bass Plaintiffs have moved for a separate trial from the Youngson plaintiffs. However, the Court is aware that a settlement in principal has been reached between Defendants and the Youngson Plaintiffs. Consequently, the motion for separate trial should be denied as moot.

### III. Motion for Status Conference and/or Pretrial Conference

The Bass Plaintiffs have moved for a status conference hearing or a pretrial hearing. The Court may order parties to appear for purposes of controlling the case, avoiding wasteful pretrial activities, and facilitating effective and efficient disposition of the case. *See* FED. R. CIV. P. 16(a).

Here, a final pretrial conference is warranted and a tentative date was set for October 15, 2019. However, in light of the continuance of the trial date discussed *infra*, the Court will confer with counsel to schedule a final pretrial conference that aligns with the rescheduled trial date.

### IV. Motion to Amend the Scheduling Order

Defendants Bobo Transportation, Inc. and Kodirov have moved to amend the scheduling order with regards to the filing of certain Motions in Limine. Specifically, Defendants agreed to schedule medical proof depositions beyond certain deadlines related to this action's scheduling

order and the bankruptcy case of Defendant Logistics Buddy Transportation, LLC. These depositions are currently set for September 27, October 8, and October 10, 2019. As discussed *supra*, a final pretrial conference was scheduled for October 15, 2019, and the Defendants have requested that the deadline for filing Motions in Limine related to the three medical depositions be extended to October 14, 2019.

Here, the Court previously continued the trial date and all accompanying deadlines in order to account for Defendant Logistics Buddy Transportation, LLC's bankruptcy case. Though the Bass Plaintiffs have expressed a desire to retain the current trial date, it is apparent that the current trial date does not provide sufficient time for the Court and the parties to adequately prepare for trial. Consequently, trial in this case should be continued and the Court will confer with counsel regarding a new trial date. Due to the continuance of trial and rescheduled final pretrial conference, Defendants' motion to amend the scheduling order should be denied as moot.

## V. Conclusion

Therefore, the P&G Defendants' motion for summary judgment [D. 155; 1:17-CV-69, D. 150] is **DENIED**. The Bass Plaintiffs' motion for separate trials [D. 197, 1:17-CV-69, D. 194] is **DENIED as moot**. The Bass Plaintiffs' motion for a pretrial conference [D. 203; 1:17-CV-69, D. 200] is **GRANTED** and counsel shall confer with the Court regarding scheduling. Trial in this case is **CONTINUED** and counsel shall confer with the Court regarding scheduling. Defendants' joint motion to amend the scheduling order [D. 209; 1:17-CV-69, D. 206] is **DENIED as moot**.

**IT IS SO ORDERED.**

**CHIEF UNITED STATES DISTRICT JUDGE**

11